## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| RAHEEM JACOBS, | : | Civil Action No. 16-1523 (JHR/AMD) |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : | **OPINION** |
|  | : |  |
| CUMBERLAND COUNTY, *et al.*, | : |  |
|  | : |  |
| Defendants. | : |  |

**APPEARANCES:**

**Surinder K. Aggarwal**
The Law Offices of Surinder K. Aggarwal
86 Court Street
Freehold, New Jersey 07728
> *Counsel for Plaintiff Raheem Jacobs*

**A. Michael Barker, Greg Paul DiLorenzo, and Vanessa Elain James**
Barker, Gelfand, James & Sarvas, P.C.
Linwood Greene, Suite 12
Linwood, New Jersey 08221
> *Counsel for Defendant Michael Williams*

**Shanna McCann**
Chance & McCann LLC
201 West Commerce Street
Bridgeton, New Jersey 08302
> *Counsel for Defendants Neal Armstrong (i/p/a Neil Armstrong), Michael*
> *Anderson, Emanual Marrero (i/p/a Emanual Morrero), and Manual Velazquez*
> *(i/p/a Manual Velesquez)*

**Daniel Edward Rybeck and Lilia Londar**
Weir & Partners LLP
20 Brace Road, Suite 200
Cherry Hill, New Jersey 08034
> *Counsel for Defendants Cumberland County and Warden Robert Balicki*

**RODRIGUEZ, Senior District Judge:**

## I.    INTRODUCTION

This civil rights matter stems from the purported use of excessive force against the plaintiff, Raheem Jacobs, by the corrections officers who removed him from Cumberland County Jail's ("CCJ's") "C" dorm on the morning of February 25, 2015.   Presently before the Court are three separate motions for summary judgment filed by defendants: (1) Michael Williams (at DE 89), a CCJ corrections officer ("CO") who was captured on video delivering three quick strikes to Jacobs as he was being handcuffed; (2) CCJ corrections officers Michael Anderson, Neil Armstrong, Emanual Marrero, and Manual Velazquez (the "Other CO Defendants") (at DE 91), all four of whom were, in varying degrees, also involved in restraining and removing Jacobs on February 25th; and (3) CCJ's warden, Robert Balicki, and Cumberland County (the "Supervisory Defendants") (at DE 90).   Jacobs opposes all three motions.   (DE 96.)   For the reasons set forth below, the Court enter summary judgment in favor of the Supervisory Defendants on all claims against them.   Williams' and the Other CO Defendants' respective motions, on the other hand, will be granted in part and denied in part.

## II.    BACKGROUND

### A.  Factual Background

On February 25, 2015, at approximately 8:35 a.m., Jacobs – who was then a pre-trial detainee – and another inmate also housed in "C" dorm, Bruce Hanby, got into a fistfight.   (*See*, *e.g.*, Jacobs' Statement of Undisputed Material Facts ("SUMF") ¶¶ 2-3, DE 96-5; *see also* CCJ's Feb. 25, 2015 Surveillance Video, DE 91-20.)   Jacobs and

Hanby's respective accounts of that altercation differ. Hanby, by way of an April 13, 2018 written statement, indicated that he "beat [Jacobs'] ass. He was bleeding. [When I hit Jacobs in the face, y]ou heard the crack throughout the dorm. [Jacobs] was bleeding from the face. . . . I had him on the ground beating him. . . . I remember stomping [Jacobs] in the body with my feet when he was on the ground, hitting him in the chest, ribs, [and] back." (DE 89-9.) Jacobs, on the other hand, testified that Hanby only managed to punch him in the lip two or three times before another inmate, Bill Matthews, broke the fight up. (*See* Jacobs' Mar 12, 2018 Dep. Tr. 28-29, DE 91-22.) Although the parties disagree on which of Jacobs' February 25th injuries are attributable to Hanby, specifically, it is undisputed that Jacobs did not walk away from that fight unscathed.

Less than five minutes later, at 8:39 a.m., CCJ corrections officers entered "C" dorm to remove the two as-of-then-unidentified CCJ inmates who fought. (*See* DE 91-20.) The officers readily identified Hanby as one of the two assailants and removed him to CCJ's medical unit. Approximately fifteen minutes later, Officers Anderson, Armstrong, Williams, and Velazquez – but not Marrero – returned to "C" dorm to remove the other individual involved in the physical altercation, *i.e.*, Jacobs. (*See* CCJ's Feb. 25, 2015 Surveillance Video, DE 91-18.) Officer Armstrong located Jacobs in the shower, observed that he had "several cuts in his upper [and] bottom lips as well as blood coming from his nose," and told him to return to his bed and get dressed. (*See* Armstrong's Feb. 25, 2015 Use of Force Report, DE 96-3 at Ex. L.)

CCJ surveillance video shows Jacobs returning to his bunk at 9:02 a.m. (*See* DE 91-18.) The soundless video further shows that one minute later, at 9:03 a.m., Officer

Armstrong approached Jacobs from behind as he was hunched over and sorting through various items on his bed. (*Id.*) Armstrong then proceeded to stand Jacobs upright and began handcuffing him from this standing position. Although there is substantial dispute between the parties as to what Jacobs and the corrections officers said to each other in the moments before Armstrong began restraining Jacobs, it does not appear from the video that Armstrong used undue force to get Jacobs to comply, nor does it appear that Jacobs was, in any way, actively resisting Armstrong's efforts to handcuff him. (*Id.*)

The surveillance video clearly shows that in the next few seconds, as Armstrong was handcuffing Jacobs, and after both of Jacobs' arms were behind him, Officer Williams delivered two quick strikes to Jacobs' neck and head, at which point, Armstrong took Jacobs to the ground as Williams swung at Jacobs for a third time. (*Id.*) Williams delivered all three blows in less than one second. (*Id.*) The video of the incident indicates that Williams' attack on Jacobs was sudden and – as far as this Court is able to observe – wholly unexpected. (*Id.*) The video conclusively shows that Armstrong and Anderson were the only two COs in the immediate proximity of Williams as he hit Jacobs.[1] (*Id.*)

Armstrong and Anderson then proceeded to restrain Jacobs on the ground as Williams loomed over all three of them. (*Id.*) The video does not completely capture Armstrong and Anderson's actions in the twenty-second period that Jacobs remained on

---

[1] Officer Velesquez, who was also present in the "C" dorm, was standing four bunks away when Williams struck Jacobs. (*See* Ortiz's SIU Report, DE 96-4 at Ex. S.) Officer Marrero was standing near an elevator located outside of "C" dorm. (*See* Marrero's Feb. 25, 2015 Use of Force Report, DE 96-3 at Ex. L.)

"C" dorm's floor; it clearly shows only that the two officers were on top of him.   (*Id.*)

While it appears, based on the Court's review of the video, that neither of these officers,

as Jacobs now claims, beat him on his head, kneed him, and punched him while he was

on the ground (*see* Jacobs' Dep. Tr. 32, DE 91-22), the video is ultimately inconclusive

on this point.   (*See* DE 91-18.)   The video, does, however, clearly refute Jacobs'

assertion that "Officer Williams was [] kicking [Jacobs] in [his] back" as he lay on the

ground.   (*See* Jacobs' Dep. Tr. 32, DE 91-22.)   The video next shows Armstrong and

Anderson standing Jacobs back up and Armstrong then escorting Jacobs out of "C" dorm

in handcuffs.   (DE 91-18.)   This entire sequence of events – beginning with Jacobs

returning to his bunk and ending with Jacobs being escorted away in handcuffs –

occurred in roughly thirty seconds.   (*See id.*)

Armstrong then walked Jacobs to CCJ's medical unit.   This walk was captured on

multiple other CCJ surveillance videos.   (*See* CCJ's Feb. 25, 2015 Surveillance Video,

DE 91-21.)   All such video evidence shows Jacobs being escorted to CCJ's medical unit

in handcuffs without further incident.   (*Id.*)   That said, it is undisputed that in the course

of taking Jacobs to medical, Armstrong led Jacobs onto an elevator that did not have a

surveillance camera.   Jacobs claims that when he got to the elevator, otherwise

unidentified corrections officers "slammed [his] face into [it]" and continued "beating

[him] up furthermore."   (*See* Jacobs' Dep. Tr. 32, DE 91-22.)   The record establishes

that the only COs involved in escorting Jacobs on and off the elevator were Officers

Armstrong and Marrero.

Jacobs received treatment for his injuries at Inspira Medical Center in Vineland,

New Jersey, on the same day of the incident. (*See* Inspira's Feb. 25, 2015 Final Report, DE 96-2 at Ex. C; *accord* Jacobs' SUMF ¶ 71, DE 96-5.) While there, Jacobs was formally diagnosed with "nasal fractures [] with mild deviation toward the right" and "facial and scalp swelling." (DE 96-2 at Ex. C.) As alluded to above, it is unclear which of these injuries are attributable to Inmate Hanby and which were caused by Officer Williams and/or the Other CO Defendants.

Whenever force is utilized, CCJ corrections officers are required to prepare and submit a use of force report ("UFR") on the same day that any such incident occurs. (*See* Supervisory Defs.' SUMF ¶ 131, DE 90-1; *accord* Jacobs' SUMF Response, DE 96-6 at p. 46; Armstrong's Mar. 23, 2018 Dep. Tr. 61-62, DE 89-6.) In accordance with this mandate, Officers Anderson, Armstrong, Williams, and Velazquez all prepared separate UFRs regarding the force utilized against Jacobs on February 25, 2015.[2] (*See* Defs.' Feb. 25, 2015 UFRs, DE 96-3 at Ex. L.)

Officer Armstrong's UFR states that when Jacobs returned to his bunk, "[Armstrong] told [Jacobs] to put his jumper on and turn around to be handcuffed. [Jacobs] was refusing to do so." (*Id.*) Armstrong reported that he then "grabbed [Jacobs'] jumper by the collar and took him face down to the ground and handcuffed him." (*Id.*) Williams' UFR indicates that "[Jacobs] took his time [getting ready] and

---

[2] Officer Marrero – who was undisputedly not present in "C" dorm when Jacobs was handcuffed and removed – also prepared a UFR. His report notes only that he "was at the elevator ready to go to medical to make sure inmate Bruce Hanby wasn't there [when Jacobs arrived]" and that he "was sent [there] by [Officer Velazquez]." (*See* DE 96-3 at Ex. L.)

was instructed again to gather his things. He refused and was grabbed by Armstrong to be cuffed. [Jacobs] struggled and was taken down, cuffed, and [removed]." (*Id.*) Anderson's report states that he "assisted in restraining [Jacobs] while he was on the ground with Officers Armstrong and [] Williams." (*Id.*) Velazquez's UFR states that Jacobs "stood up in an aggressive manner [as he was collecting his things and] started towards [Armstrong] who proceeded to take him to [the] ground and handcuff him from behind." (*Id.*) Notably, not one of these UFRs indicates that Williams struck Jacobs.

In accordance with CCJ's standard practice, defendants' February 25, 2015 use of force reports – like all other UFRs – were reviewed internally by, among others, a CCJ sergeant, lieutenant, and captain. (*See* Balicki's May 14, 2018 Dep. Tr. 27-29, DE 90-2 at Ex. 17.) The CCJ captain who reviewed the defendants' UFRs, Radames Morales Jr., concluded, based on his contemporaneous review of the surveillance video of the incident, that the force utilized on Jacobs was not justified. (*See* Morales' Feb. 25, 2015 UFR, DE 90-2 at Ex. 6.) Captain Morales then presented the matter to Warden Balicki, directly, for further review. (*See* Balicki's Dep. Tr. 23-25, DE 90-2 at Ex. 17.) On February 25, 2015, Balicki – after personally watching the video – referred the matter to Sergeant Heriberto Ortiz of the Cumberland County Department of Corrections Special Investigation Unit ("SIU"). (*See* June 30, 2016 Internal Affairs Investigation Report, DE 96-3 at Ex. N.) On that same day, Sergeant Ortiz reviewed defendants' UFRs and the Jacobs video. (*See id.*) Based on that review, Ortiz "found that there was sufficient evidence to substantiate Inmate Jacobs['] allegation of excessive force." (*Id.*) On February 26, 2015, Ortiz contacted the Cumberland County Prosecutor's Office and

requested that the it perform a "legal review" of the incident.  (*Id.*; *see also* Supervisory Defs.' SUMF ¶ 156, DE 90-1.)

Over the next several months, Sergeant Ortiz and the Prosecutor's Office investigated the matter in tandem.  On June 19, 2015, Ortiz interviewed Officer Armstrong about his involvement in the February 25th incident.  (*See* Ortiz's SIU Report, DE 96-4 at Ex. S.)  Ortiz found that Armstrong's assertion that "Jacobs was verbally aggressive and non-compliant" – as Armstrong reported in his UFR and again reaffirmed during his June 19th interview – was inconsistent with the video evidence. (*Id.*)  On June 25, 2015, Ortiz interviewed Officer Anderson.  (*Id.*)  During that interview, Anderson conceded that he witnessed Williams strike Jacobs.  (*Id.*)  When Anderson explained that his UFR did not include that observation because "he was taught to only write in his reports what he had done[,]" Ortiz – who was previously Anderson's training supervisor – countered that he had expressly trained Anderson to "document what you observed and to document what your actions are."  (*Id.*)  Anderson then conceded that "he had left a lot out of his [UFR]" and that he "just [wrote] what he did" – and not "what happened" – because that was what he was instructed to do by his supervisor, Officer Velazquez.  (*Id.*)  On July 13, 2015, Ortiz interviewed Velazquez. Ortiz concluded that Velazquez's UFR was inaccurate insomuch as he "did not witness the entire incident as it transpired [because he was approximately four bunks away, with an obstructed view, and his attention was otherwise diverted]."  (*Id.*)

On July 15, 2015, Cumberland County initiated civil disciplinary proceedings against Anderson, Armstrong, Velazquez, and Williams.  (*See* July 15, 2015 Notices of

Disciplinary Action, DE 90-2 at Exs. 11-14.) Anderson and Armstrong were charged with providing false information in their respective UFRs. (*See id.* at Exs. 11-12.) Velazquez was charged with failing to appropriately supervise the situation. (*See id.* at Ex. 13.) Williams faced disciplinary charges because he was "observed on camera using excessive force on [Jacobs] on [February 25, 2015]." (*See id.* at Ex. 14.) Williams was also charged criminally. (*See*, *e.g.*, Asst. Prosecutor Shapiro's June 2, 2015 Letter, DE 90-2 at Ex. 24.)

The record demonstrates – and Jacobs does not dispute – that Anderson, Armstrong, Marrero, Velazquez, and Williams all received excessive force training on multiple occasions prior to February 25, 2015. (*See*, *generally*, Supervisory Defs.' SUMF ¶ 161, DE 90-1; Jacobs' SUMF Response, DE 96-6.) CCJ Captain Michael Palau's deposition testimony on the scope of this training indicates that CCJ corrections officers are instructed on appropriate use of force during a 120-hours initial training course and at a subsequent 12-14 weeks' long academy program, and that each officer is thereafter required to undergo twice-yearly use of force training. (*See* Palau's July 2, 2018 Dep. Tr. 14-17, 26-29, DE 90-2 at Ex. 20.) It is undisputed that CCJ's use of force policy on February 25, 2015 required that "[i]n any case when a corrections officer uses force to control inmates, the minimum force possible under the circumstances shall be used." (*See* Sept. 12, 2001 Use of Force Policy, DE 90-2 at Ex. 30.) Furthermore, the parties agree that no complaints for excessive force had ever been made against any of the individual CO defendants prior to February 25, 2015. (*See* Supervisory Defs.' SUMF ¶ 161, DE 90-1; *accord* Jacobs' SUMF Response, DE 96-6 at p. 50.)

## B. Procedural Background

Jacobs initiated this action, through prior counsel, on March 18, 2016. (Compl., DE 1.) Jacobs, again through prior counsel, filed his amended complaint, *i.e.*, the pertinent pleading in this matter, on May 1, 2017. (DE 34.) Count I is a 42 U.S.C. § 1983 excessive force/failure to intervene claim against Officer Williams, and the Other CO Defendants, *i.e.*, Armstrong, Anderson, Marrero, and Velazquez (hereinafter collectively referred to as the "Corrections Officer Defendants" or simply the "CO Defendants"). Count II is a § 1983 conspiracy claim against the CO Defendants.[3] Count III is a § 1983 municipal liability claim against Cumberland County/supervisory liability claim against Warden Balicki. Count IV is a New Jersey Civil Rights Act ("NJCRA") claim against all named defendants. Count V is a state law assault and battery tort claim against the Corrections Officer Defendants.

On December 21, 2018, Officer Williams, Cumberland County and Balicki, and the Other CO Defendants each filed their respective summary judgment motions. (DEs 89, 90, and 91.) On February 5, 2019, Jacobs filed one omnibus opposition to all three motions. (DE 96.) On March 11, 2019, the defendants each filed their respective reply briefs. (DEs 100, 101, and 102.)

---

[3] Although Jacobs' pleading does not specify which statutory provision this "Conspiracy to Violate Civil Rights" claim is asserted under (*see* DE 34 at 6), his February 5, 2019 opposition clarifies that this claim arises under 42 U.S.C. § 1983. (*See* DE 96 at 11-19.)

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   Disputes over irrelevant or unnecessary facts will not preclude the Court from granting a motion for summary judgment.   *Id.*

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   "A party asserting that a fact [is not] genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents . . . , affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."   Fed. R. Civ. P. 56(c)(1)(A). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."   *Celotex*, 477 U.S. at 324 (internal quotation marks omitted).   To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that

contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)). "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F. 3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). Again, the Court's role in deciding a motion for summary judgment is simply "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

Finally, where, as here, there is video footage related to the claims, the Court will not draw inferences that are "blatantly" inconsistent with the video evidence. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007) ("the facts [should be viewed] in the light depicted by the videotape."); *accord Castellani v. City of Atl. City*, No. 13-5848, 2017 WL 3112820, at *5 (D.N.J. July 21, 2017). Video evidence does not blatantly contradict a non-movant's account for summary judgment purposes when there is an obstruction that "block[s] the view of the camera" so that the video "does not show what happened

12

during . . . crucial moments." *McDowell v. Sheerer*, 374 F. App'x 288, 292-93 (3d Cir. 2010).

## IV.   DISCUSSION

### a.  42 U.S.C. § 1983, the NJCRA, and Qualified Immunity

Jacobs' constitutional claims are governed by 42 U.S.C. § 1983, which provides a civil remedy against any person who, under color of state law, deprives another of rights protected by the United States Constitution.  *See Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992).   Any analysis of § 1983 should begin with the language of the statute:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.   As the above language makes clear, § 1983 is a remedial statute designed to redress deprivations of rights secured by the Constitution and its subordinate federal laws.  *See Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979).   By its own words, therefore, § 1983 "does not . . . create substantive rights."  *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Baker*, 443 U.S. at 145 n.3).

To state a cognizable claim under 42 U.S.C. § 1983, a plaintiff must allege a "deprivation of a constitutional right and that the constitutional deprivation was caused by a person acting under the color of state law."  *Phillips v. County of Allegheny*, 515

F.3d 224, 235 (3d Cir. 2008).  Thus, a plaintiff must demonstrate two essential elements to maintain a claim under § 1983: (1) that he was deprived of a "right or privileges secured by the Constitution or the laws of the United States" (2) by a person acting under the color of state law.  *Williams v. Borough of West Chester*, 891 F.2d 458, 464 (3d Cir. 1989); *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (noting that § 1983 does not provide substantive rights; rather, it provides a vehicle for vindicating violations of other federal rights).

A similar analysis applies to any claim under the New Jersey Civil Rights Act. *Hartman v. Gloucester Township*, No. 12-2085, 2014 WL 2773581, at *6 (D.N.J. June 19, 2014); *accord Armstrong v. Sherman*, No. 09-716, 2010 WL 2483911, at *5 (D.N.J. June 4, 2010) ("the language of the [NJCRA], like the language of 42 U.S.C. § 1983, appears to grant a cause of action only to those persons whose rights have been personally violated.")[4]

The doctrine of qualified immunity provides that "government officials performing discretionary functions . . . are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Thus, government officials are immune from suit in their

---

[4] For this reason, the Court will not undertake separate analysis of Jacobs' parallel claims under the New Jersey Civil Rights Act.  "This district has repeatedly interpreted NJCRA analogously to § 1983."  *Pettit v. New Jersey*, 2011 WL 1325614, at *3 (D.N.J. Mar. 30, 2011).  "[W]hen pled together, [the NJCRA and § 1983] are analyzed under the same standard [.]"  *Id.* at *4; *see also Hottenstein v. Sea Isle City*, 793 F. Supp. 2d 688, 695 (D.N.J. 2011).

individual capacities unless, "taken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right" and "the right was clearly established" at the time of the objectionable conduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Courts may exercise discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "If the plaintiff fails to make out a constitutional violation, the qualified immunity inquiry is at an end; the officer is entitled to immunity." *Bennett v. Murphy*, 274 F.3d 133, 136 (3d Cir. 2002).

This doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably" and it "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (internal quotation omitted). Properly applied, qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). That is, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his

conduct was unlawful in the situation he confronted." *Couden v. Duffy*, 446 F.3d 483, 492 (2006). "If the officer's mistake as to what the law requires is reasonable," the officer is entitled to qualified immunity. *Id.* (internal citations omitted). Further, "[i]f officers of reasonable competence could disagree on th[e] issue, immunity should be recognized." *Malley*, 475 U.S. at 341 (1986); *see also Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (the general touchstone is whether the conduct of the official was reasonable at the time it occurred). Finally, because qualified immunity is an affirmative defense, the burden of proving its applicability rests with the defendant. *See Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001).

### b. Summary judgment is denied as to all CO Defendants, other than Velazquez, on Jacobs' excessive force claim

The CO Defendants all move for summary judgment on Jacobs' excessive force claim. Williams argues that "no reasonable jury could find that [his] use of physical force [against Jacobs on February 25, 2015] was unreasonable and in violation of 42 U.S.C. § 1983." (DE 89-1 at 13.) Armstrong, Anderson, Marrero, and Velazquez each separately claim that summary judgment is appropriate because "there is nothing in the record to support that [any of them] struck, punched, kicked or used any inappropriate force against Jacobs." (DE 91-1 at 8, 10-11.) The CO Defendants also all invoke the defense of qualified immunity. (DE 89-1 at 30; DE 91-1 at 16.)

Because Jacobs was a pretrial detainee on February 25, 2015, his excessive force claim is analyzed under Fourteenth Amendment Due Process standards. *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015); *Graham*, 490 U.S. at 395 n.10 ("the Due Process

Clause protects a pretrial detainee from the use of excessive force that amounts to punishment."); *see also Bell v. Wolfish*, 441 U.S. 520 (1979); *accord Sanders v. County of Camden*, No. 15-1129, 2017 WL 3332056, at \*9 (evaluating pretrial detainee's § 1983 claim that CO defendants utilized excessive force against him on January 27, 2013 under the standard announced in *Kingsley* in 2015). For Jacobs' to prevail on this claim, he "must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 135 S. Ct. at 2473. Considerations that are relevant to this determination include "the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.*

Initially, the Court notes that the undisputed facts of record show that Velazquez, himself, never had any physical contact with Jacobs on February 25th. Indeed, the video evidence before the Court never shows Velazquez touching Jacobs, even once, as he was being restrained and removed from the "C" dorm and thereafter escorted to CCJ's medical unit. This finding is also entirely consistent with other documentary evidence in the record (*see, e.g., generally*, Velazquez's June 28, 2018 Dep. Tr., DE 91-9; Jacobs' Resp. to Defs.' First Set of Interrogs., DE 91-17.) Summary judgment is accordingly granted in favor of Velazquez on Jacobs' § 1983 and NJCRA excessive force claims. *See Kornegey v. City of Philadelphia*, 299 F. Supp. 3d 675, 680 (E.D. Pa. 2018) ("to prevail in a civil rights action, a plaintiff must demonstrate that the defendant was personally involved in the alleged wrongful conduct"); *see also Shaw by Strain v.*

*Strackhouse*, 920 F.2d 1135, 1147 (3d Cir. 1990) ("Only those defendants whose inactions or actions personally caused [a plaintiff's] injury may be held liable under § 1983.").

Summary judgment on Jacobs' excessive force claim will be denied as to all other CO Defendants because there are factual disputes about Armstrong, Anderson, Marrero, and Williams' respective physical interactions with Jacobs on February 25th that bear on the Court's excessive force and qualified immunity analysis. With respect to Williams, there is abundant record evidence from which a jury could infer that his use of force against Jacobs on February 25, 2015 was objectively unreasonable. This evidence includes, *inter alia*, multiple investigative and disciplinary documents which conclude that Williams' use of force was excessive and otherwise improper, as well as a video which clearly shows Williams delivering three strikes, in rapid succession, to a defenseless and seemingly non-resisting Jacobs.

That same video evidence also undisputedly demonstrates Armstrong and Anderson's direct involvement in subduing, handcuffing, and otherwise physically restraining Jacobs as he was being removed from "C" dorm. The two officers' interactions with Jacobs that are depicted on that video do not, in the Court's view, appear to show that either officer utilized an objectively unreasonable amount of force on Jacobs. Critically, however, the video footage fails to capture the Armstrong and Anderson's specific actions in the twenty-second period after Armstrong took Jacobs to the ground; it definitively demonstrates only that they were both on top of Jacobs. While it does not appear, based on the Court's review of the video, that either of these

officers, as Jacobs now claims, beat him on his head, kneed him, and punched him while he was on the ground (*see* Jacobs' Dep. Tr. 32, DE 91-22), the video is ultimately inconclusive on this point. (*See* DE 91-18.) The Court must accordingly assume that Jacobs' account of events is correct. *McDowell*, 374 F. App'x at 292-93 (if there is an obstruction that "block[s] the view of the camera" so that the video "does not show what happened during . . . crucial moments[,]" that video evidence cannot be relied to refute a non-movant's account of events at the summary judgment stage). In light of these evidentiary considerations, the Court is precluded from concluding, as a matter of law, that Armstrong and Anderson did not utilize excessive force against Jacobs in CCJ's "C" dorm on February 25, 2015. *See Ringgold v. Keller*, 608 F. App'x 102, 103-04 (3d Cir. 2015) (reversing district court's award of summary judgment on plaintiff's § 1983 excessive force claim against corrections officer defendants – which largely relied on security camera footage of incident – where plaintiff "testified at his deposition that he felt multiple officers punching, kicking, and kneeing him, and the video [did] not categorically rule out the possibility that [defendants] were doing just that.").

It is undisputed that Williams and Anderson had no further physical contact with Jacobs on February 25th after he was removed from "C" dorm. Armstrong, on the other hand, thereafter personally escorted Jacobs to CCJ's medical unit. This walk was captured on multiple surveillance cameras. (*See* CCJ's Feb. 25, 2015 Surveillance Video, DE 91-21.) All such footage shows Jacobs being taken to the medical unit in handcuffs without further incident. (*Id.*) That said, it is also undisputed that during this walk, Armstrong – then briefly accompanied by Marrero – led Jacobs onto an elevator

that did not have a surveillance camera.   At his deposition, Jacobs testified that when he got to the elevator, certain otherwise unidentified COs "slammed [his] face into the elevator" and continued "beating [him] up furthermore."   (*See* DE 91-22 at 32, 41.) Marrero and Armstrong, for their part, deny that any such incident occurred in the elevator.   (*See* Marrero's Dep. Tr. 18-20, DE 91-8; Armstrong's Dep. Tr. 57-59, DE 91-6.)   Resolution of this disputed factual issue is material to Jacobs' excessive force claim against Marrero and Armstrong.   *See*, *e.g.*, *Ringgold*, 608 F. App'x at 104 ("the extent of each officer's participation is a factual dispute to be resolved by the jury.").

Viewing the record in the light most favorable to Jacobs, a reasonable factfinder could conclude that the amount of force used by Armstrong, Anderson, Marrero, and Williams in each of their respective interactions with Jacobs, described above, was objectively unreasonable.   A juror could determine from the video evidence that Jacobs did not pose a threat to the officers and was complying with their directives, *i.e.*, that Jacobs was not resisting.   Indeed, under Jacobs' account of events, the force that the CO Defendants allegedly used on him, first in "C" dorm and thereafter on the elevator, was wholly unprovoked, completely unwarranted, and entirely unjustified.   Moreover, Jacobs' February 25, 2015 medical records demonstrate that sustained injuries and, affording Jacobs all favorable inferences, those injuries are attributable almost entirely to the CO Defendants.   In sum, the record construed in the light most favorable to Jacobs sufficiently supports an excessive force claim against all of the CO Defendants, other than Velazquez.

The foregoing factual disputes likewise preclude the Court from granting summary judgment to Armstrong, Anderson, Marrero, and Williams on the ground of qualified immunity. Each of these corrections officers would have known that their actions against Jacobs on February 25th, if true, violated then clearly established law. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009) ("The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'") (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). As of February 25, 2015, it was clear "that the Due Process Clause protect[ed] a pretrial detainee from the use of excessive force that amounts to punishment." *Graham*, 490 U.S. at 395 n.10. It was also then clearly established that a qualified immunity determination would turn on whether officers' use of force was "rationally related to a legitimate nonpunitive governmental purpose" and whether it was "excessive in relation to that purpose." *Wolfish*, 441 U.S. at 561. Affording Jacobs all favorable inferences, these CO Defendants would have known that respective acts of force towards him were excessive and illegitimate.

For the foregoing reasons, the Court will deny Anderson, Armstrong, Marrero, and Williams' respective requests for entry of summary judgment on Jacobs' NJCRA and § 1983 excessive force claims.

### c. Summary judgment is granted in favor of all CO Defendants on Jacobs' failure to intervene claim

"[A] corrections officer's failure to intervene in a beating can be the basis of liability . . . under § 1983 if the corrections officer had a reasonable opportunity to intervene and simply refused to do so." *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002). To make out a *prima facie* case of failure to intervene, a plaintiff must prove that the officer: (1) had a duty to intervene; (2) had a realistic and reasonable opportunity to intervene; and (3) failed to interveve. *Id.* at 650-51; *accord Hartman v. Gloucester Township*, No. 12-2085, 2014 WL 2773581, at *14 (D.N.J. June 19, 2014) ("The inquiry is whether the officer was in a position to see the violation and had a reasonable amount of time to intervene.").

Defendants argue that this claim should be dismissed, in its entirety, because Jacobs "will be unable to show at trial that any of the individual [corrections officer] defendants 'ignored a realistic opportunity to intervene.'" (DE 91-1 at 14 (quoting *Smith*, 293 F.3d at 651-52).) Jacobs opposes entry of summary judgment on this claim as to Anderson, Armstrong, and Williams only. (DE 96 at 10.) He argues that "there was a realistic and reasonable opportunity for [each of these defendants] to intervene and prevent Williams from continuing to assault Plaintiff after he struck Plaintiff in the throat." (*Id.*) Jacobs' argument ignores the compelling video evidence which shows that Williams delivered all three strikes against Jacobs in rapid succession, in less than one second, without any apparent warning. This footage conclusively shows that there was no realistic opportunity for any individual, corrections officer or otherwise, to

prevent Williams' actions.   Summary judgment is accordingly granted in favor of all CO

Defendants on Jacobs' § 1983 and NJCRA failure to intervene claims.

### d. Summary judgment is denied as to all CO Defendants, except for Marrero, on Jacobs' conspiracy to violate civil rights claim

The CO Defendants aver that the evidence of record fails to establish a *prima facie*

civil conspiracy claim.[5]   (DE 89-1 at 35-57; DE 91-1 at 14-16.)   Jacobs counters that

there is sufficient factual support in the record to substantiate a § 1983 civil conspiracy

claim against each of the CO Defendants.   The Third Circuit's 2018 precedential

decision in *Jutrowski v. Township of Riverdale*, 904 F.3d 280 (3d Cir. 2018), is

particularly relevant to the parties' respective summary judgment positions:

> To prevail on a conspiracy claim under § 1983, a plaintiff
> must prove that persons acting under color of state law
> "reached an understanding" to deprive him of his
> constitutional rights.  *Adickes v. S.H. Kress & Co.*, 398 U.S.
> 144, 150-52 [] (1970).   Such rights include, of course, those
> protected by the Due Process Clause of the Fourteenth
> Amendment, such as the "right to be heard in an impartial
> forum,"  *Great W. Mining & Mineral Co. v. Fox Rothschild
> LLP*, 615 F.3d 159, 161 (3d Cir. 2010), and the "right of
> access to the courts,"  *Monroe v. Beard*, 536 F.3d 198, 205
> (3d Cir. 2008).   Those rights "assure[] that no person will be
> denied the opportunity to present to the judiciary allegations
> concerning violations of . . . constitutional rights."  *Wolff v.
> McDonnell*, 418 U.S. 539, 579 [] (1974).

---

[5]   "The elements of a conspiracy to violate federal civil rights are that (1) two or more
persons conspire to deprive any person of constitutional rights; (2) one or more of the
conspirators performs . . . any overt act in furtherance of the conspiracy; and (3) that
overt act injures the plaintiff in his person or property or deprives the plaintiff of any
right or privilege of a citizen of the United States, with the added gloss under § 1983 that
the conspirators act under the color of state law."  *Jutrowski*, 904 F.3d at 294 n.15 (citing
*Barnes Foundation v. Township of Lower Merion*, 242 F.3d 151, 162 (3d Cir. 2001))
(internal quotations and bracketing omitted).

. . . [D]eprivations of the right of access to the courts arise most often in the prison context, *see, e.g.*, *Peterkin v. Jeffes*, 855 F.2d 1021, 1036 (3d Cir. 1988)[;] this right is . . . denied when [prison officials,] conspire to cover up constitutional violations, *see, e.g.*, *Colbert[ v. City of Chicago*, 851 F.3d 649, 657-58 (7th Cir. 2017)] (holding that the plaintiff could allege under § 1983 that "the named officers participated in something akin to a 'conspiracy of silence among the officers' in which defendants refuse to disclose which of their number has injured the plaintiff"). A "conspiracy of silence" among [prison officials] is actionable as a § 1983 conspiracy because the coordinated officer conduct "impede[s] an individual's access to courts" and renders "hollow" a victim's right to redress in a court of law. *Vasquez v. Hernandez*, 60 F.3d 325, 328-29 (7th Cir. 1995) ("[W]hen police officers conceal or obscure important facts about a crime from its victims rendering hollow the right to seek redress, constitutional rights are undoubtedly abridged."); *see also Swiggett v. Upper Merion Twp.*, No. 08-2604, 2008 WL 4916039, at *4 (E.D. Pa. Nov. 17, 2008) ("[C]ourts have found that concealing a constitutional violation, including use of excessive force, does not amount to a separate constitutional violation unless the victim of the concealment was deprived of his right of access to the courts.").[6]

After a plaintiff establishes that the object of the conspiracy was the deprivation of a federally protected right, "the rule is clear that" the plaintiff "must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action." *Capogrosso v. Supreme Court of N.J.*, 588 F.3d 180, 184-85 (3d Cir. 2009) (citing *Crabtree v. Muchmore*, 904 F.2d 1475, 1481 (10th Cir. 1990)). To show agreement, he must demonstrate that "the state actors named as defendants in the[] complaint somehow reached an understanding to deny [the plaintiff] his rights," *Kost v. Kozakiewicz*, 1 F.3d 176, 185 (3d Cir. 1993) . . . .

---

[6] "The right of access to the courts is sourced from both 'the First and Fourteenth Amendments,' *Monroe*, 536 F.3d at 205, and is typically framed as a due process right in the inmate context[.]" *Jutrowski*, 904 F.3d at 294 n.17.

*Jutrowski*, 904 F.3d at 293-95.

In accordance with *Jutrowski*, summary judgment will be denied as to Armstrong, Anderson, Velazquez and Williams on Jacobs' § 1983 conspiracy claim.   Not one of these defendants made any mention of Williams' hitting Jacobs in their UFRs, notwithstanding that all four officers were present in "C" dorm, and, affording Jacobs all reasonable inferences, witnessed the incident in its entirety.   Jacobs also points to other significant discrepancies between the factual narratives provided by these officers in their UFRs and at their subsequent depositions and what the video of the incident demonstrates, *e.g.*, that Jacobs was not, as the officers' claim, acting verbally aggressive and noncompliant.   (*See* DE 96 at 12-17.)   The subsequent investigations conducted by CCJ's internal affairs department and the Cumberland County Prosecutor's Officer – and the resulting reports and documents generated by, among others, Sergeant Ortiz – conclude that material information was omitted from all four officers' respective UFRs and that their failure to include this critical information was, at best, incredibly suspicious, and, at worst, potentially criminal.   Indeed, all four officers were subject to disciplinary actions as a result of those investigations.   Jacobs also accurately notes that compelling evidence in the record suggests that "immediately following the incident, Velazquez directed Anderson to only write what his involvement was in his report.   This directive went against the training Anderson received on report writing – that he was to write down what he witnessed and the actions he undertook.   Despite knowing this went against his training, Anderson complied with Velazquez's directive."   (DE 96 at 17-18 (internal citations to record omitted).)

In short, it is undisputed that Officers Armstrong, Anderson, Velazquez, and Williams each, at the very least, omitted important facts about Williams' assault from their respective UFRs. Moreover, there is evidence in the record which plausibly suggests that the omission of this information was coordinated, agreed-upon, and done to prevent Jacobs from seeking redress for Williams' purported use of excessive force against him. Because Jacobs has therefore pointed to facts in the record which show that Armstrong, Anderson, Velazquez, and Williams were all party to an actionable and otherwise legally viable § 1983 after-the-fact conspiracy, summary judgment is denied on Jacobs' § 1983 and NJCRA conspiracy claims as to all four of these defendants.[7] *See*

---

[7] The Court acknowledges that the Third Circuit's *Jutrowski* decision – in which it "recognized a theory of a § 1983 conspiracy to cover up constitutional violations . . . when the defendants have conspired to prevent a potential plaintiff from obtaining the information needed to make a valid legal claim [that] implicates the First Amendment right of access to the courts" (*see Murphy v. Middlesex County*, 361 F. Supp. 3d 376, 390-91 (D.N.J. 2019) – was decided in 2018, well after the February 25, 2015 incident in question. Insomuch as the CO Defendants would like to invoke the doctrine of qualified immunity because their purported after-the-fact conspiratorial actions did not violate a then-clearly established constitutional right, that attempt would fail. First, the right of a pretrial detainee to have meaningful access to the courts was clearly established in 2015. *See Jutrowski*, 904 F.3d at 293-95 (citing numerous pre-2015 cases which support this proposition). Second, as of February 25, 2015, the CO Defendants would have understood that their complete omission of Williams' use of force against Jacobs from their UFRs would have deprived Jacobs of that right and was otherwise "unlawful in the situation confronted." *Curley v. Klem*, 499 F.3d 199, 206-07 (3d Cir. 2007). Third, "the burden of establishing the affirmative defense of qualified immunity lies with the party seeking to invoke it." *Murphy*, 361 F. Supp. 3d at 390-91. Here, the CO Defendants' respective summary judgment briefs do not address qualified immunity as to Jacobs' civil conspiracy claim specifically. (*See* DE 89-1 at 33 (arguing only that "Williams should be entitled to Qualified Immunity [with respect to Jacobs'] claims against [him] for excessive use of force"; *accord* DE 91-1 at 17 (broadly arguing for qualified immunity because "the facts of this case show that all of the individual defendants acted entirely reasonable under the circumstances.").) In light of these considerations, the Court concludes that the CO Defendants have not met their

*Ewing v. Cumberland County*, 152 F. Supp. 3d 269, 301 (D.N.J. 2015) (denying summary judgment on plaintiff's civil conspiracy claim as to certain corrections officer defendants where there was "evidence that all five [COs] conspired to cover up their actions by submitting [UFRs] that significantly downplayed the amount of force they used against Plaintiff" and "a reasonable inference could be made [from the evidence of record] that the reports were falsely written to try to cover up what happened."); *accord Jutrowski*, 904 F.3d at 296 ("where a plaintiff adduces sufficient evidence of an after-the-fact conspiracy to cover up misconduct, even of an unidentified officer, he may be able to state a claim under § 1983").

Conversely, summary judgment will be granted in favor of Marrero because the evidence of record fails to support a *prima facie* § 1983 conspiracy claim against that defendant.   As noted above, Marrero was not present in "C" dorm when Williams struck Jacobs.   Because Marrero undisputedly did not witness this incident, his omission of any reference to that event in his UFR was entirely appropriate.   Moreover, there is no evidence in the record which suggests that Marrero – unlike the other four CO Defendants – concealed or obscured facts from his UFR in order to impede to Jacobs' excessive force case.   Insomuch as Jacobs is arguing that Marrero's alleged use of excessive force towards Jacobs on the elevator precludes the Court from entering summary judgment on this claim – and it does not appear that he is (*see*, *generally*, DE 96) – the Court would find such an argument uncompelling.   As noted above, other than

_____

affirmative burden to show entitlement to qualified immunity on Jacobs' after-the-fact conspiracy claim.

27

Jacobs' deposition testimony that his head was slammed his into CCJ's elevator by otherwise unidentified corrections officers, nothing in the record suggests that Marrero ever even touched Jacobs – much less utilized excessive force against him – during the parties' limited interactions on February 25, 2015. Instead, the record makes clear that Marrero – unlike the other four CO Defendants – was never reprimanded or subject to disciplinary proceedings for his actions on February 25th. Jacobs has likewise failed to point to any record evidence which suggests that information about the alleged elevator incident, even if true, was omitted from Marrero's UFR pursuant to a conspiratorial agreement with the other CO Defendants. Jacobs has accordingly failed to "provide some factual basis to support the existence of the elements of a conspiracy" as to Marrero. *Jutrowski*, 904 F.3d at 295. Summary judgment is therefore granted in favor of Marrero on Jacobs' § 1983 and NJCRA conspiracy claims. *See Ewing v. Cumberland County*, 152 F. Supp. 3d 269, 301 (D.N.J. 2015) (granting summary judgment in favor of corrections officer defendant on plaintiff's conspiracy claim because there was "no evidence in the record that [he] was present or even aware of the [relevant incident of excessive force], nor [was] there any evidence that he participated in, knew, or acquiesced in an agreement to cover up the beating.").

### e. Officer Williams' request to limit Jacobs' recoverable damages is denied

Officer Williams moves for summary judgment on Jacobs' claim for punitive damages. (DE 89-1 at 39.) He argues that "[e]ven if [Jacobs] could establish underlying liability as to Williams . . . [he] has failed to present sufficient evidence that

the conduct of Williams rose to the level of egregiousness necessary to establish a punitive damages claim." (DE 89-1 at 39.) As the Court's discussion, *supra*, concerning excessive force and civil conspiracy make clear, issues of disputed fact preclude the Court from granting Williams' request. *See Springer v. Henry*, 435 F.3d 268, 281 (3d Cir. 2006) ("A jury may award punitive damages when it finds reckless, callous, intentional or malicious conduct."); *Smith v. Whitaker*, 160 N.J. 221, 242 (1999) (to obtain punitive damages a "plaintiff must prove by clear and convincing evidence a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to the consequences."). Williams' motion for summary judgment will be denied as to this issue.

Williams similarly avers that "[i]f any of [Jacobs'] claims survive summary judgment, [his] claims for physical and/or emotional distress damages" should still be dismissed and he "should [instead] be limited only to nominal damages" because the evidence of record indicates that all of Jacobs' injuries were caused by inmate Hanby, not Williams. (DE 89-1 at 38-39.) This request will be denied. As noted above, the extent of Jacobs' physical injuries that are specifically attributed to Williams is in dispute. Moreover, Jacobs, through his deposition testimony, has presented evidence that he has suffered emotional harm, including post-traumatic stress syndrome, as a direct result of the assault. (*See* DE 91-22 at 84-88.) The Court therefore cannot, as a matter of law, find that Jacobs suffered no physical and/or emotional harm from Williams' actions.

### f. Summary judgment is granted in favor of Cumberland County on Jacobs' *Monell* claim

Jacobs asserts that Cumberland County is liable to him under § 1983 because it failed to properly train and supervise CCJ corrections officers, including the CO Defendants, with respect to their use of excessive force on CCJ inmates (Jacobs' "*Monell* claim"). (*See* Am. Compl., DE 34 at ¶¶ 37-46; *accord* Jacobs' Summ. J. Br. at 33-40, DE 96.) Cumberland County, like other municipal entities, is a "person" subject to liability under 42 U.S.C. § 1983. *Monell v. Dept. of Social Services*, 436 U.S. 658, 691 (1978). "A municipality[, however,] cannot be held liable for the unconstitutional acts of its employees on a theory of *respondeat superior*." *Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014) (citing *Monell*, 436 U.S. at 691). Instead, "[a] plaintiff seeking to hold a municipality liable under section 1983 must demonstrate that the violation of rights was caused by the municipality's policy or custom."[8] *Id.*; *accord McTernan v. City of York*, 564 F.3d 636, 657 (3d Cir. 2009). "Liability is imposed when the policy or custom itself violates the Constitution or when the policy or custom, while not unconstitutional itself, is the moving force behind the constitutional tort of one of its employees." *Id.* (citations and internal quotations marks omitted).

Where, as here, the challenged policy "concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure

---

[8] "Policy is made when a decisionmaker possess[ing] final authority to establish a municipal policy with respect to the action issues an official proclamation, policy, or edict." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990). Conduct is considered a custom "when, though not authorized by law, such practices of state officials [are] so permanently and well-settled as to virtually constitute law." *Id.*

amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact." *Thomas*, 749 F.3d at 222 (quoting *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999)). Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his[/its] action." *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 410 (1997); *see also Benhaim v. Borough of Highland Park*, 79 F. Supp. 3d 513, 523 (D.N.J. 2015) ("the plaintiff must show that the failure to train 'reflects a deliberate or conscious choice' by the municipality.") (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). Under this stringent standard, a plaintiff must ordinarily point to a "pattern of similar constitutional violations by untrained employees." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). That said, in certain situations, the need for training is "'so obvious' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights," even without a pattern of constitutional violations. *City of Canton*, 489 U.S. at 390 n.10. A municipality may accordingly be liable after a single incident when the violation of constitutional rights is a "highly predictable consequence of failing to equip [its] officers with specific tools to handle recurring situations." *Bryan County*, 520 U.S. at 408-09; *Connick*, 563 U.S. at 64 (a single incident may trigger municipal liability where unconstitutional consequences for failure to train are "patently obvious").

In addition, "the identified deficiency in a [municipality's] training program must be closely related to the ultimate injury; or in other words, the deficiency in training [must have] actually caused the constitutional violation." *Thomas*, 749 F.3d at 222

(quoting *City of Canton*, 489 U.S. at 391) (internal quotation marks omitted); *accord*

*Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 2000) (to establish causation, the

plaintiff must demonstrate a "plausible nexus" or "affirmative link" between the custom

and the specific deprivation of constitutional rights at issue). Stated somewhat

differently, "the plaintiff[, in addition to establishing the municipality's deliberate

indifference, must also] show that the deficient training of officers is closely related to

the injury he ultimately suffered." *Benhaim*, 79 F. Supp. 3d at 523. The focus of this

inquiry "must be on the adequacy of the training program in relation to the tasks the

particular officers must perform." *Id.* (quoting *City of Canton*, 489 U.S. at 390).

Importantly, "liability [will not] arise on the tautological grounds that the injury in

question would not have occurred if officers had been trained to avoid that particular

injury; such a claim 'could be made about almost any encounter resulting in injury.'" *Id.*

(quoting *City of Canton*, 489 U.S. at 391).

Cumberland County argues that summary judgment on Jacobs' failure to train

claim is appropriate because he "is unable to point to a County policy or custom that

would have a plausible nexus or affirmative link to [the] excessive force being inflicted

upon him [because the use of excessive force by CCJ corrections officers on CCJ

inmates] is inconsistent with the officers' training and on-the-job experience, as well as

common sense, that force greater than what is called for in a particular situation is

improper." (DE 90-3 at 12-13.) The Court agrees.

First, it is undisputed that all of the CO Defendants received use of force training

on multiple occasions prior to the February 25, 2015. Indeed, the record unquestionably

demonstrates that all of the CO Defendants attended an academy where they were initially trained, over the course of several months, to serve as CCJ corrections officers, and that each of them thereafter received additional use of force training on a bi-annual basis. It is also undisputed that on February 25, 2015, CCJ's official policy on the use of force against inmates – which was read to CCJ corrections officers during their bi-annual training (*see* Palau's Dep. Tr. 14-15, DE 90-2 at Ex. 20) – required that CCJ officers "use the minimum force possible [to control inmates]" in any given situation. (*See* Sept. 12, 2011 Use of Force Policy, DE 90-2 at Ex. 30.) Indeed, "[t]he fact that [Williams and the Other CO Defendants] chose not follow the training given to [them] does not mean that [they were] not trained." *Ringgold v. Keller*, No. CIV.A. 11-974, 2014 WL 1317604, at *7 (W.D. Pa. Mar. 31, 2014), *rev'd on other grounds*, 608 F. App'x 102 (3d Cir. 2015).

Jacobs does not contend that the CO Defendants were never trained on the use of force. His argument in opposition to Cumberland County's motion is instead, at its essence, that under the single-incident theory of *Monell* liability, the use of force training given to CCJ corrections officers was insufficient. (DE 96 at 33-40.) To support this claim, he relies primarily on the "contradictory" deposition testimony of the CO Defendants as to "the training they received on Use of Force" that avers "reveals a lack of command on the subject." (*Id.* at 37.) Jacobs, quite correctly, points to certain testimony in the CO Defendants' depositions that indicates that the bi-annual use of force training was frequently short in duration and was considered to be of limited practical utility to certain seasoned officers. He also accurately notes that during their depositions, the CO Defendants were sometimes unable to recite from memory the

33

various levels of force they were trained to employ against inmates. Jacobs also claims that the testimony of CCJ Captain Michael Palau demonstrates that the specific use of force training provided to CCJ corrections officers did provide them with "specific tools" to prevent them from using excessive against inmates. (*Id.* at 40.) Even affording Jacobs all favorable inferences, these factual considerations do not preclude the Court from entering summary judgment in favor of Cumberland County on his *Monell* claim.

Critically, "[l]iability [for a failure to train claim] cannot rest only on a showing that the employees 'could have been better trained or that additional training was available that would have reduced the overall risk of constitutional injury.'" *Thomas*, 749 F.3d at 226 (quoting *Colburn v. Upper Darby Township*, 946 F.2d 1017, 1029-30 (3d Cir. 1991). "Rather, the causation inquiry focuses on whether 'the injury [could] have been avoided had the employee been trained under a program that was not deficient in the identified respect.'" *Id.* (quoting *City of Canton*, 489 U.S. at 391). Jacobs' opposition does not identify which particular aspects of the training were deficient; Jacobs claims only that the use of force training provided to CCJ corrections officers could have been better. Moreover, Jacobs has not provided any expert opinion that substantiates that position. He therefore has "not identified the precise deficiency in training or how the deficiency contributed to a violation of [Jacobs'] constitutional rights[.]" *Noble v. City of Camden*, 112 F. Supp. 3d 208, 224 (granting summary judgment on municipal liability claim based on, among other reasons, plaintiff's failure to identify any specific training deficiency). In other words, Jacobs has failed to point to any facts that demonstrate that Cumberland County's purportedly inadequate training was the moving force behind the

CO Defendants' purported utilization of excessive force against Jacobs.

Furthermore, Jacobs "has produced no evidence showing that these alleged training deficiencies were the result of a deliberate choice made by [Cumberland County].   That lack, even standing alone, is sufficient to defeat the claim." *Benhaim*, 79 F. Supp. 3d at 524 (granting summary judgment in favor of municipality on plaintiff's failure to train claim); *Ringgold*, 2014 WL 1317604, at *7 (granting summary judgment on plaintiff's supervisory liability claims where [the defendant officer's] application of force was sudden and unexpected [and therefore could not] be contributed to any alleged conduct on the part of [supervisory defendants] and the alleged measures [plaintiff] claims they could have employed would not have prevented the incident from occurring.").

In light of the foregoing considerations, the Court will enter summary judgment in favor of Cumberland County on Jacobs' *Monell* claim.   *Adams v. City of Atlantic City*, 294 F. Supp. 3d 283, 305 (D.N.J. 2018) (granting summary judgment on municipal failure to train claim against non-K-9 police officers where city "produced records indicating that its officers regularly underwent yearly in-service training specifically in the area of use of force" and plaintiff failed to "cite[] to anything within the evidentiary record regarding any specific deficiencies in [that] training program."); *Garcia v. City of Newark*, No. 08-1725, 2011 WL 689616, at *5 (D.N.J. Feb. 16, 2011) (granting summary judgment on failure to train claim against municipality where plaintiff had "not submitted any evidence as to how Newark police officers are instructed with regard to the use of force and effectuating arrests, nor . . . explained why such training [was] inadequate [and

likewise] neglected to proffer a Newark Police Department training manual or expert witness on the subject [or other] evidence of deficiencies in the training officers receive or examples of training needed" because without such evidence "it [could not] be said that the need for more or additional training [was] so obvious as to constitute deliberate indifference on the part of the City.").

### g. Summary judgment is granted in favor of Warden Balicki on Jacobs' supervisory liability claim

Jacobs likewise asserts that Warden Balicki is liable to him because Balicki failed to properly supervise CCJ corrections officers to ensure that they did not use excessive force.   (*See* Am. Compl. ¶¶ 37-46, DE 34; Jacobs' Summ. J. Br. 20, DE 96.)   There are two ways which Balicki, as the warden of CCJ, can be held liable under § 1983 for the unconstitutional acts of his subordinates.   First, liability may attach if it can be shown that Balicki, in his role as a CCJ policymaker, and "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused the constitutional harm."   *A.M. ex rel. J.M.K. v. Luzerne County Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004).   In order to state a *prima facie* claim under this theory, Jacobs must identify a supervisory policy or practice that Balicki failed to employ, and then prove that: (1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) that Balicki was aware that the policy created an unreasonable risk; (3) that Balicki was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement the supervisory practice or procedure.   *Barkes v. First Correctional Medical, Inv.*, 766 F.3d

307, 317 (3d Cir. 2014), *rev'd on other grounds sub nom*, *Taylor v. Barkes*, 124 S. Ct. 2042 (2015). Under the second theory, Balicki "may be personally liable under § 1983 if he . . . participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations. *A.M. ex rel.*, 372 F.3d at 586.

As an initial matter, nothing in the record indicates that Balicki "participated in violating [Jacobs'] rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *Id.* Instead, the record evidence, detailed above, shows that Balicki referred the Jacobs' incident to the Cumberland County Prosecutor's Office on the same day he reviewed the surveillance video of Jacobs being restrained and taken out of "C" dorm, and further, that Anderson, Armstrong, Williams, and Velazquez all faced disciplinary actions as a result of that investigation. The record further shows that Williams and Armstrong, *i.e.*, the two officers on the video who had significant physical contact with Jacobs, were reassigned by Balicki to posts where they would have no contact with inmates for the duration of the investigation. (*See* Balicki's Dep. Tr. 25, DE 90-2 at Ex. 17.) Furthermore, it is undisputed that no complaints for excessive force had ever been made against any of the CO Defendants prior to February 25, 2015. (*See* Supervisory Defs.' SUMF ¶ 161, DE 90-1; *accord* Jacobs' SUMF Response, DE 96-6 at p. 50; Palau's Mar. 13, 2018 Declar., DE 90-2 at Ex. 27; Sandy Zimmerman's Mar. 14, 2018 Declar. DE 90-2 at Ex. 28.)

Balicki – relying on these undisputed facts – argues that summary judgment is appropriate because Jacobs "cannot point to any evidence to suggest Warden Balicki was

in any way deliberately indifferent to [Jacobs'] civil rights." (DE 90-3 at 14.) Jacobs, on the other hand, contends that "the record reveals that Balicki's failure to supervise . . . amounts to deliberate indifference." (DE 96 at 20.) Jacobs, in support of that assertion, raises the same claims and arguments regarding the purportedly inadequate use of force training provided to the CO Defendants that the Court has already concluded are insufficient to defeat summary judgment on his *Monell* claim. Jacobs also points to certain portions of Balicki's deposition testimony which he claims demonstrate that "[d]espite concerns, Balicki took no meaningful action to improve officer training regarding reasonable force in dealing with inmates." (DE 96 at 22.) None of these arguments preclude the Court from granting summary judgment to Balicki.

Indeed, "it is not enough for a plaintiff to argue that the constitutionally cognizable injury would not have occurred if the superior had done more than he or she did." *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir.1989). Rather, there must exist a close relationship between the supervisor's deficient conduct and the ultimate injury. *City of Canton*, 489 U.S. at 391 (1989); *Sample*, 885 F.2d at 1118. In other words, the supervisor's acts must be the "moving force [behind] the constitutional violation." *Harris*, 489 U.S. at 389 (citations omitted); *accord Ricker v. Weston*, 27 F. App'x 113, 119 (3d Cir. 2002) (granting supervisors' motion for summary judgment because there was "simply no causal link" between plaintiff's injuries and what the supervisors did or did not do.). Ultimately, "[n]o matter how [Jacobs] attempts to frame the issue (be it a lack of training in the appropriate use of force, failure to monitor and supervise employees, failure to investigate incidents of abuse, *etc.*) the simple fact is that

[Williams'] application of force was sudden and unexpected.   [It therefore] cannot be contributed to any alleged conduct on the part of [Balicki.]"   *Ringgold*, 2014 WL 1317604, at *7.

In the alternative, the Court finds that Balicki is entitled to qualified immunity. Jacobs has not established that Balicki violated a clearly established constitutional right, as he has not identified a case where a supervisor acting under similar circumstances as Balicki was held to have violated a pretrial detainee's constitutional rights.   *See White v. Pauly*, 137 S. Ct. 548, 552 (2017) (reiterating that the clearly established law must be "particularized" to the facts of the case).

As such, the Court will grant summary judgment in favor of Warden Balicki on Jacobs' § 1983 and NJCRA supervisory liability claims.   *See Holliday, v. City of Elizabeth*, No. 13-1006, 2018 WL 953346, at *13 (granting summary judgment to police chief plaintiff's supervisory liability claim where plaintiff "fail[ed] to identify any genuine issues of material fact that could give rise to a showing of a policy, practice, or custom that proximately caused Plaintiff's alleged constitutional harms [perpetrated by the subordinate officer accused of utilizing excessive force]" and "offer[ed] insufficient evidence that [the police chief] inadequately trained [that individual].").

### h. Summary judgment is granted in favor of all defendants on Jacobs' state law assault and battery claim

The New Jersey Tort Claims Act ("NJTCA") requires that a notice of a claim of injury against a public entity or employee be filed with the appropriate public entity prior to bringing a suit in an appropriate court.   *See* N.J.S.A. § 59:8-3 ("No action shall be

brought against a public entity or public employee under this act unless the claim upon which it is based shall have been presented in accordance with the procedure set forth in this chapter."). A plaintiff "shall be forever barred from recovering damages from a public entity or employee [on a cause of action for death or for injury or damage to person or to property] if: [he] fail[s] to file his claim with the public entity within ninety (90) days of accrual of that claim[,]" *see* N.J.S.A. § 59:8-8, subject to the additional caveat that he "may, in the discretion of a judge of the Superior Court, be permitted to file such notice at any time within one year after the accrual of his claim provided that the public entity or the public employee has not been substantially prejudiced thereby." N.J.S.A. § 59:8-9.

In this case, Jacobs concedes that he never filed an NJTCA-required notice of claim before he filed suit in this Court. (*See* Williams' SUMF ¶ 48, DE 89-2; *accord* Jacobs' SUMF Response, DE 96-6 at p. 9.) The Court is accordingly compelled, pursuant to N.J.S.A. § 59:8-8, to dismiss Jacobs' state law assault and battery claim with prejudice. *Noble*, 112 F. Supp. 3d at 233-34 ("Because Plaintiff did not file a notice of claim pursuant to N.J.S.A. 59:8-8, Plaintiff's state law [tort] claims are barred and will be dismissed with prejudice."); *accord*, *e.g.*, *Guzman v. City of Perth Amboy*, 518 A.2d 758, 760-61 (N.J. Super. Ct. App. Div. 1986) (holding that plaintiff's claims were barred because plaintiff failed to comply with the notice requirement under N.J.S.A. 59:8-8);

## V. CONCLUSION

For the foregoing reasons, the Court will enter summary judgment in favor of Cumberland County and Warden Balicki on all of Jacobs' claims against those two

40

defendants.   Summary judgment will likewise be entered in favor of all CO Defendants on Jacobs' state law assault and battery claim and on Jacobs' § 1983 and NJCRA failure to intervene claims.   The CO Defendants' motion for summary judgment on Jacobs' § 1983 and NJCRA excessive force claim will be denied as to all defendants other than Velazquez.   Summary judgment on Jacobs' § 1983 and NJCRA conspiracy claims will be denied as to all defendants other than Marrero.   An appropriate Order accompanies this Opinion.


Date: May 31, 2019                                    s/ Joseph H. Rodriguez_____
                                                              HON. JOSEPH H. RODRIGUEZ
                                                              United States District Judge